BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
RUTH A. HARVEY
Director
MICHAEL J. QUINN
Senior Litigation Counsel
JOHN R. KRESSE
John.Kresse@usdoj.gov
Direct 202-598-3811 / Fax 202-514-9163
T. DIETRICH HILL
Trial Attorneys
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street NW, 7th Floor
Box 875, Ben Franklin Station
Washington, DC 20044-0875
*Attorneys for Plaintiff United States of America*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>    Plaintiff,<br><br>    v.<br><br>**OLYMPIA HEALTH CARE LLC,**<br>**ALECTO HEALTHCARE SERVICES, LLC,**<br>**MPT OF LOS ANGELES, L.P.,**<br>**MPT OF OLYMPIA, LLC,**<br>**MPT OPERATING PARTNERSHIP, L.P.,**<br>**MEDICAL PROPERTIES TRUST, INC.,**<br>**SHERMAN/GRAYSON HOSPITAL, LLC,**<br>**ALECTO HEALTHCARE SERVICES**<br>    **SHERMAN, LLC,**<br>**LAXMAN REDDY, MATTHEW WILLIAMS,**<br>**and JEREMY REDIN,**<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 2:23-cv-01783**<br><br>**COMPLAINT** |

The United States of America brings this action against Defendants, on behalf of the Centers for Medicare and Medicaid Services, to recover money owed to the United States and pleads:

## INTRODUCTION

1.      The United States seeks to recover overpayments made to Defendant Olympia Health Care, LLC ("Olympia") by the Centers for Medicare and Medicaid Services ("CMS"), part of the Department of Health and Human Services, in 2005. Olympia has never disputed

this debt. Instead, Olympia has contended that it lacks the financial resources to satisfy the debt. But while continuing to owe the United States over $10 million, Olympia paid a wide variety of other creditors and made multiple transfers of several times that sum to others, including to its own affiliates.

2.     Defendant Alecto Healthcare Services, LLC ( "Alecto") controlled Olympia during the relevant period. In operating Olympia, Alecto effectively treated Olympia as if it were part of Alecto, administering Olympia's operations and funds as its own, including directing the transfer of Olympia's funds to other Alecto-owned companies to support their operations. At the time Alecto directed these transfers, Olympia was insolvent. Alecto itself also appears to have been a beneficiary of Olympia's transfers of its funds—again, all while Olympia continued to owe millions to the United States.

3.     The officers who controlled Alecto and Olympia during this period and directed these transfers knew, or should have known, of Olympia's debt to the United States. They nevertheless directed Olympia to keep paying Olympia's long- and short-term debts even when Olympia was insolvent, before paying its debt to the United States. After Olympia made all these transfers, but still without paying its debt to the United States, Alecto closed Olympia's business and sold the associated properties.

4.     Defendant MPT of Olympia ("MPT Olympia") held a substantial interest in Olympia and was also its mortgage lender, through its subsidiary MPT of Los Angeles, LLC ("MPT LA"). When Olympia went out of business, MPT LA and MPT Olympia received proceeds from the sale of the associated real estate and other assets—an amount much greater than Olympia's debt to the United States—while Olympia continued to claim that it was unable to pay. MPT LA, MPT Olympia, and their parent companies thus obtained money that should have gone to the United States.

5.     The United States now seeks to recover the undisputed sum owed to it from all those legally responsible for the debt, including not only Alecto and Olympia, but (1) all individuals and entities responsible, in whole or in part, for Olympia's failure to repay the

United States, and (2) all entities that benefitted from Olympia's transfers when Olympia should have first been satisfying its debt to the United States.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. § 1345 because the United States is the plaintiff.

7.     Venue is proper in this district because a substantial part of the events giving rise to the claims occurred in the district.

## PARTIES

8.     Plaintiff the United States of America is the sovereign. During the events relevant here, the United States acted through CMS.

9.     Defendant Olympia is a limited liability company formed under the laws of California, with its principal place of business in Los Angeles, California. For most of the relevant time period, it owned and operated Olympia Medical Center, a hospital that provided healthcare services in Los Angeles, including services covered by Medicare.

10.     Defendant Alecto is a limited liability company formed under the laws of Delaware, with its principal place of business in Irvine, California. Alecto indirectly holds a controlling interest in Olympia through an intermediary, Alecto Healthcare Services Los Angeles, LLC ("Alecto LA").

11.     Defendant MPT LA is a limited partnership formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT LA was a lender to Olympia and other Alecto-owned entities and mortgagee of certain associated real property.

12.     Defendant MPT Olympia is a limited liability company formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Olympia owns 100% of MPT LA and a non-controlling interest in Alecto LA.

13.     Defendant MPT Operating Partnership, L.P. ("MPT Partnership") is a limited partnership formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Partnership owns a controlling interest in MPT Olympia.

3

14.     Defendant Medical Properties Trust, Inc. ("MPT Parent") is a corporation formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Parent indirectly wholly owns and controls MPT Partnership and therefore indirectly wholly owns and controls MPT LA and MPT Olympia as well (all four, collectively, the "MPT Entities").

15.     Defendant Sherman/Grayson Hospital, LLC ("Sherman Hospital") is a limited liability company formed under the laws of Delaware, with its principal place of business in Sherman, Texas. Sherman Hospital owns and operates Wilson N. Jones Regional Medical Center, a hospital in Sherman, Texas.

16.     Defendant Alecto Healthcare Services Sherman, LLC ("Alecto Sherman") is a limited liability company formed under the laws of Delaware, with its principal place of business in Irvine, California. Alecto owns a controlling interest in Alecto Sherman, and Alecto Sherman owns a controlling interest in Sherman Hospital.

17.     Defendant Laxman (a/k/a "Lex") Reddy is a co-founder of Alecto and has served as its chief executive officer ("CEO") from its founding until the present. Reddy has also served on Alecto's board of managers. On information and belief, Reddy is a resident of California.

18.     Defendant Matthew Williams served as CEO and chief financial officer ("CFO") of Olympia from approximately 2014 to 2021. On information and belief, Williams is a resident of California.

19.     Defendant Jeremy Redin has served as Alecto's CFO from approximately 2018 until the present. On information and belief, Redin is a resident of California.

## GENERAL ALLEGATIONS

### *Olympia's Debt to CMS*

20.     CMS is the federal agency charged with administering the Medicare program. Medicare includes four parts—Parts A, B, C, and D—that encompass different types of health care and consequently require different procedures for payment from CMS to healthcare providers. Medicare Part A is part of the traditional or original Medicare program, and covers

4

in-patient hospital treatments and other institutional care. In administering this Part, CMS makes payments directly to the healthcare providers. For certain kinds of providers, CMS typically pays the provider before all of the claims are made, using an estimate of the amount that CMS will owe the provider for services over the course of the year. This estimate is based on the ratio between a hospital's expenses and what it charges. At the end of each year, CMS compares its payments to the provider's actual Medicare claims and determines whether CMS underpaid, and owes an additional amount to the provider, or overpaid, in which case the provider owes CMS the amount of the overpayments.

21.     In 2005, CMS substantially overpaid Olympia, then a new Medicare provider, for Medicare services. Because Olympia was a new provider, CMS estimated its payments based on the state-wide average cost ratio rather than historical data about Olympia's actual cost ratios. But Olympia's actual cost ratio was substantially lower, causing CMS's payments to exceed the amount actually owed to Olympia for Medicare Part A services. In 2011, CMS notified Olympia of the estimated overpayments. After full review, CMS's contractor Noridian Healthcare Solutions made a final determination in 2016 that Olympia owed $14,211,115 for the 2005 overpayments.

22.     Olympia did not challenge this determination. Instead, acknowledging the debt, Olympia asserted that it would be unable to pay CMS and requested a compromise that would allow it to pay far less than $14 million. While the Department of Justice was considering whether to authorize the Department of Health and Human Services to compromise the debt, Olympia continued to make payments on the debt, mostly interest but some principal payments as well. CMS also recouped some funds from Medicare payments that would otherwise have gone to Olympia. As a result, Olympia owes the United States approximately $11 million in principal and  approximately $1.4 million in accrued interest, and continues to accrue interest.

### *Alecto's Acquisition and Operation of Olympia*

23.     During the relevant period, Alecto's business model was to acquire healthcare providers in financial difficulty and provide management services to the acquired company, with the goal of turning them into profitable enterprises. In 2013, as part of this strategy,

Alecto acquired a majority interest in Olympia. An Alecto subsidiary, Alecto LA, acquired 80% of Olympia, with the remaining 20% owned by an individual. Alecto, in turn, owned 80% of Alecto LA; the other 20% of Alecto LA was owned by MPT Olympia, one of the MPT Entities that helped finance the acquisition.[1] As part of the same transaction, Alecto also acquired a 100% interest in non-party Horizon Real Estate Holdings LLC ("Horizon"), which owned the hospital property, and Alecto LA indirectly acquired a medical office building and parking garage used by Olympia through two non-party subsidiaries, Plaza Medical Office Building, LLC ("Plaza") and Sunrise Real Estate Holdings, LLC ("Sunrise"). In total, Alecto paid $10 million to acquire these interests.

24.    As part of the same transaction, MPT Olympia's affiliate MPT LA loaned Alecto $20 million, with Olympia and Horizon as co-obligors. This loan was secured by, among other things, a mortgage on Olympia and Horizon's real property, and Alecto LA's ownership interests in both Olympia and Horizon. The loan was intended partly to pay off existing debt, and partly to finance the $10 million acquisition payment.

25.    Alecto and the MPT Entities knew or should have known that they were acquiring Olympia subject to its liabilities for Medicare overpayments. The merger agreement explicitly noted that Alecto, Alecto LA, and Olympia understood that Olympia had outstanding Medicare repayment debts. In its own financial statements, Alecto stated that as part of the acquisition, *both* Alecto and Olympia "assumed a $15,300,000 third-party liability related to the 2005 Medicare cost report."

26.    Simultaneously with the acquisition, Alecto and Olympia entered into a Management Services Agreement. In this agreement, the parties agreed that Alecto would provide management services as an "independent contractor," and that Olympia would retain control over its own assets and the operation of the hospital. In exchange for Alecto's services, Olympia agreed to pay a set management fee (4% of its net revenues).

---

[1] Although Alecto holds a controlling interest in Alecto LA, MPT Olympia had priority in receiving profits.

27.     Despite this agreement, Alecto promptly acted in ways that disregarded the corporate distinction between Alecto and Olympia. Alecto's board, rather than Olympia's, exercised direct control over Olympia's finances. Olympia's board did not hold its own financial board meetings, and Olympia's CEO involved Alecto's officers directly in financial decisionmaking. Olympia never paid management fees to Alecto; Alecto's officers provided their services without charge to Olympia, functioning as de facto officers of Olympia rather than employees of an independent contractor. Alecto likewise appears to have ignored the distinctions between and among Alecto, Alecto LA, Plaza, Horizon, and Sunrise.

28.     Alecto's officers also elided the distinction between Alecto and Olympia when, in 2014, they directed Alecto to make an interest-free loan of $7 million to Olympia to cover Olympia's operating expenses. Alecto made the loan with no formal documentation; Olympia's CEO simply emailed Alecto's CFO, who directed Alecto to wire the money to Olympia's account. Olympia apparently paid off this loan by early 2017. This loan was part of a pattern of Alecto and Olympia's officers using the financial resources of the two entities as though they were a single company.

### *Olympia's Line of Credit and Tranfers of Funds to Other Alecto Hospitals*

29.     Starting in 2015, Olympia obtained lines of credit for at least $15 million from a series of lenders. As common in these transactions, the line of credit was secured by Olympia's receivables. The line of credit also had an important feature: it was a joint line of credit shared by all of Alecto's hospitals.

30.     Olympia was not the only financially challenged hospital that Alecto acquired as part of its business. Alecto also acquired Fairmont Regional Medical Center in Fairmont, West Virginia; Ohio Valley Medical Center in Wheeling, West Virginia; East Ohio Regional Hospital in Martins Ferry, Ohio; and Wilson N. Jones Regional Medical Center in Sherman, Texas. Alecto acquired the Sherman and Fairmont hospitals in 2014, and the Wheeling and Martins Ferry hospitals in 2017. After failing to turn around their financial condition, Alecto closed all of these hospitals in 2019 and 2020, except the hospital in Sherman, Texas.[2]

---

[2] East Ohio Regional Hospital appears to have since reopened under new ownership.

31.     As with Olympia, Alecto acquired and owned these hospitals through a web of intermediate entities. Alecto owns the Sherman hospital, the only one remaining open, through defendants Sherman Hospital and Alecto Sherman.

32.     Having these troubled Alecto hospitals as co-borrowers on the shared line of credit became problematic. Beginning in 2018, Alecto used the line of credit as a conduit to transfer funds financed by Olympia to the other Alecto hospitals. Because the Alecto hospitals were co-borrowers, one hospital could borrow against the line of credit while another paid off the balance. As pertinent here, when another of Alecto's hospitals borrowed money, Olympia would pay down the credit balance, and that would make more credit available for another hospital to borrow against. After another of Alecto's hospitals again borrowed against the line of credit, Olympia would then pay down the new balance by transferring more funds to the lender, and the cycle would continue. Thus, although the credit limit was approximately $15 million, so long as Olympia had more receivables, that income stream could be repeatedly redistributed from Olympia to Alecto's other hospitals.

33.     Initially, Olympia used the line of credit,  simply drawing on funds as necessary and repaying the lenders for amounts Olympia borrowed. At the end of 2016, Alecto's financial statements show that Olympia had a liability of approximately $2.8 million on the shared line of credit. At that time, Sherman Hospital was using the line of credit as well, recording a liability of over $10 million on the line of credit. Other Alecto hospitals did not record any liability on the line of credit—they had either not used the line of credit or repaid fully any funds they received through the line of credit. Thus, at the end of 2016, Olympia had received slightly more funds from the line of credit than it had repaid. It had not yet begun to use the line of credit to funnel money to the other Alecto hospitals.

34.     During 2017, other Alecto hospitals began to borrow significantly more from the line of credit than they repaid. The Fairmont hospital received $3.1 million more from the line of credit, the Ohio Valley hospital received $4.7 million more, and Sherman Hospital recorded a liability of $13.9 million (meaning that during 2017 it had accrued approximately $3 million more in liability on the line of credit). By contrast, Olympia now recorded a

negative "liability" of $100,000 on the line of credit, meaning that it had paid more funds into the line of credit than it had borrowed, enabling other Alecto-owned hospitals to draw more funds from the line of credit.

35.     In 2018, Olympia began to pay even more to the line-of-credit lender than it borrowed, paying down the debt incurred by other Alecto hospitals and effectively transferring its own funds indirectly to those hospitals as those hospitals drew repeatedly on the line of credit. By the end of 2018, Olympia had, on net, paid $11.6 million into the line of credit; Fairmont hospital and Sherman Hospital then drew on that newly available credit, recording line-of-credit liabilities of $10.1 million and $21.5 million, respectively. Alecto's funneling of Olympia's funds to the other Alecto-owned hospitals had no benefit to Olympia. Nor, apparently, did Alecto ever expect that Olympia would be repaid.

36.     Olympia's subsidizing of the other hospitals accelerated in 2019 and 2020. In 2019 alone, Olympia poured almost $20 million more into the other Alecto-owned hospitals via the line of credit, meaning Olympia had transferred in total $31.4 million to the other hospitals. But Olympia's balance sheet at the end of 2019 recorded that $31.4 million as a credit, thus making Olympia look financially far better than it was. Even with that distortion, Olympia's total equity—i.e., its value as a company—was still negative $800,000. Olympia was nominally valueless, and actually far in debt. These transfers continued in 2020; in June 2020, Olympia recorded that it had transferred an additional $7.4 million during the first half of 2020. And now even with a $38.8 million credit on its balance sheet, Olympia's recorded equity value of Olympia still fell to negative $3.8 million.

37.     In sum, between 2018 and 2020, Alecto siphoned Olympia's cash flow to subsidize its other, nominally independent, struggling hospitals—a largely failed effort that led to three of those four hospitals closing by March 2020. Those closures ensured that Olympia would never recover the funds that Alecto diverted to support the other hospitals. By June 2020, Alecto acknowledged in its consolidated financial statements that Olympia would never recover the funds it had indirectly transferred to other Alecto hospitals; Olympia anticipated writing off the entire amount transferred up to that point, over $38 million.

38.     Nevertheless, Alecto *continued* to diminish Olympia's value by transferring its funds to other entities via the line of credit. During the second half of 2020, Olympia paid over $10 million more into the credit facility, increasing the total amount transferred to $49 million. And at least some of the total $49 million appears to have gone directly to Alecto, rather than being used to support other Alecto-owned hospitals. Indeed, little or none of the total $17.8 million Olympia paid into the credit facility during 2020 was used to keep other hospitals open; two closed in 2019, a third closed in March 2020, and Sherman Hospital's financial statements do not show that it benefitted from Olympia's 2020 "intercompany" transfers. Records and correspondence from Alecto indicate that Alecto itself was retaining these funds.

39.     All of these transfers took place in the face of Olympia's unpaid debt to CMS of well over $10 million—and even as Olympia claimed to CMS that it had an inability to pay its debt.

### *Olympia's Insolvency and Closure*

40.     As early as 2013, when Alecto acquired Olympia, Olympia was insolvent. Olympia's financial statements for 2013 and 2014 show that Olympia's liabilities exceeded its assets. Alecto's undocumented $7 million loan to Olympia in 2014, apparently to meet payroll, also indicates that Olympia was unable to pay its debts in the ordinary course of business.

41.     Olympia's financial statements for 2015 through 2020 also failed to reflect certain liabilities that rendered Olympia insolvent. For example, in 2015, Olympia's statements represent that it had slight net positive equity, of just over $3 million. But Olympia failed to recognize, at the very least, Alecto's management fees, which had been accumulating since 2013 and already amounted to about $7 million. This unrecorded liability exceeded the stated value of the company. In succeeding years, Olympia never accounted for this growing liability, which rendered Olympia increasingly insolvent.

42.     Olympia's books also failed to reflect the true nature of its intercompany transfers to Alecto's other, nominally independent hospitals. Olympia's balance sheets recorded its excess transfers as negative balances under the line of credit entry for 2017 through 2020. Thus, on paper, these amounts were owed to Olympia by its co-borrowers. But

Olympia acknowledged in its own financial statements that Alecto's other hospitals were unable to return or repay Olympia's transfers. Recording its transfers as debt owed to Olympia—effectively, an asset—misrepresented the nature of these transfers. Had they properly been recorded, either as bad debt or, more accurately, transfers of Olympia's funds for the benefit of Alecto, Olympia would not have been solvent in any year from 2018 through 2020 (even ignoring the unbooked management fees owed to Alecto and the undocumented loan from Alecto, which independently rendered Olympia insolvent in prior years).

43. Throughout 2014 through 2020, despite apparently never becoming profitable, Olympia continued to pay other debts, such as payroll and vendors, while declining to pay its debt to CMS. Olympia's financial statements reflect that these operating expenses totaled tens of millions of dollars each year. In 2014, Olympia's expenses totaled approximately $97 million; in 2015, $110 million; in 2016, $96 million; in 2017, $77 million; in 2018, $73 million; in 2019, $71 million; and in the first six months of 2020, $35 million. But Olympia never made more than modest payments on its CMS debt of $14.2 million.

44. Olympia also made payments on debt held by affiliates, including mortgages held by MPT LA and MPT Olympia. Based on Olympia's financial statements and other Olympia documents, Olympia made the full payments on its mortgage to affiliate MPT LA, about $2.2 million per year, from 2014 through 2020. In 2014, MPT Olympia (the part-owner of Alecto LA) had also made an additional $10 million loan to Olympia and Horizon, providing for interest-only payments totalling $1.1 million for three years, followed by repayment of principal in 2017. Thus, Olympia was repaying debt to both MPT Olympia and MPT LA during these periods, while still not paying the CMS debt.

45. In early 2021, Alecto sold Alecto LA's indirectly owned real property to UCLA Health and announced that Olympia would close its doors in March 2021. Approximately $51 million of proceeds from this sale were used to pay debts owed to MPT entities, ultimately benefitting MPT Partnership and MPT Parent. None of the proceeds were used to pay CMS.

***The Individual Defendants***

46.     The individual defendants, Reddy, Williams, and Redin, were officers at Alecto or Olympia who at relevant times had control over Olympia's finances, including its payments of debts in the ordinary course of business and its transfers of funds to other entities through the line of credit.

47.     Two of these defendants worked at Alecto. Reddy was a founder of Alecto who served as its CEO at all relevant times. Because Alecto ignored the distinction between Alecto and Olympia as separate entities, on information and belief as Alecto's CEO Reddy exercised control over Olympia's finances. Redin served as Alecto's CFO beginning in approximately 2018 and, like Reddy, on information and belief exercised control over Olympia's finances.

48.     Williams served as CEO of Olympia at all relevant times. He also served as Olympia's CFO up until early 2019. As such, Williams directly controlled Olympia's finances, including its payments to vendors and employees, and its transfers of funds through the line of credit.

## CLAIMS FOR RELIEF

### First Claim for Relief – Final Administrative Determination of Medicare Overpayments
### Against Defendant Olympia

49.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

50.     The United States, through CMS, paid Olympia for Medicare services under the relevant Medicare Part A regulations.

51.     CMS, through its contractor, determined that in 2005, CMS had overpaid Olympia, and issued a notice of program reimbursement to Olympia directing Olympia to repay $14,211.115, plus 10% interest. *See* 42 C.F.R. § 413.62(f) (retroactive adjustment of reimbursements); 42 C.F.R. § 405.1803(c) (contractor determination of retroactive adjustment and notice of program reimbursement).

52.     Olympia did not challenge this determination by requesting an administrative hearing or otherwise. The contractor's determination that Olympia owed CMS $14,211.115,

plus 10% interest, is therefore final. *See* 42 U.S.C. § 405.1807 (contractor determination is final unless properly challenged in accordance with regulations).

53.     After some payments from Olympia and recoupment by CMS of certain funds that would otherwise have been paid to Olympia, Olympia owes the United States reimbursement of $11,059,170.17 in principal, plus $1,421,027.62 in interest as of February 28, 2023, and interest continues to accrue at 10% per annum.

54.     The United States is therefore entitled to recover damages from Olympia in an amount to be determined.

**<u>Second Claim for Relief – Alter Ego Liability for Olympia's Debt Owed to CMS</u>**

**Against Defendant Alecto**

55.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

56.     The United States, through CMS, paid Olympia for Medicare services under the relevant Medicare Part A regulations.

57.     CMS, through its contractor, determined that in 2005, CMS had overpaid Olympia, and issued a notice of program reimbursement to Olympia directing Olympia to repay $14,211.115, plus 10% interest. *See* 42 C.F.R. § 413.62(f) (retroactive adjustment of reimbursements); 42 C.F.R. § 405.1803(c) (contractor determination of retroactive adjustment and notice of program reimbursement).

58.     Olympia did not challenge this determination by requesting an administrative hearing or otherwise. The contractor's determination that Olympia owed CMS $14,211.115, plus 10% interest, is therefore final. *See* 42 U.S.C. § 405.1807 (contractor determination is final unless properly challenged in accordance with regulations).

59.     After some payments from Olympia and recoupment by CMS of certain funds that would otherwise have been paid to Olympia, Olympia owes the United States reimbursement of $11,059,170.17 in principal, plus $1,421,027.62 in interest as of February 28, 2023, and interest continues to accrue at 10% per annum.

60.     Alecto is also liable for this debt because at all relevant times it acted as the alter ego of Olympia.

61.     Alecto failed to respect corporate formalities, including by governing Olympia's financial operations while Olympia's board failed to hold finance-related board meetings. Alecto also failed to respect corporate formalities when Alecto's own officers managed Olympia without payment of contractually required management service fees or any other consideration to Alecto.

62.     Alecto operated Olympia for its own benefit at the expense of Olympia, including by siphoning Olympia's funds to itself or other Alecto-owned entities without any benefit to Olympia, and did so when Olympia was insolvent.

63.     Holding Alecto responsible for Olympia's debt is fair, equitable, and—given the importance of the Medicare program—in the public interest.

64.     The United States is therefore entitled to recover damages from Alecto in an amount to be determined.

### Third Claim for Relief – Violation of the Federal Priority Statute, 31 U.S.C. § 3713
#### Against Defendants Reddy, Williams, and Redin

65.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

66.     During the relevant period, Reddy, Williams, and Redin were officers and representatives of Olympia or of Alecto (which disregarded the distinctions between Alecto and Olympia). Each one of the three named defendants, during part or all of the relevant period, were responsible for the finances of Olympia, and had control over payments made by Olympia.

67.     During the relevant period, Olympia was insolvent. Under proper accounting methods, at all times Olympia's debts exceeded its assets. Olympia was also insolvent because it lacked sufficient assets to pay its debts in the ordinary course of business.

68.     During the relevant period, Olympia committed acts of bankruptcy under the Federal Priority Statute by, among other things, making preferential transfers to affiliated

entities while insolvent. These transfers included payments to MPT LA and MPT Olympia to repay loans made by those companies, repayment of a loan made by Alecto to Olympia, and transfers to other Alecto-owned hospitals via the shared line of credit.

69.     Throughout the entire relevant period, Olympia owed a debt to the United States. Reddy, Williams, and Redin knew or should have known of this debt.

70.     Reddy, Williams, and Redin, during the periods in which they controlled Olympia's finances, directed Olympia to pay other debts, including those incurred in the ordinary course of business, before paying Olympia's debt to the United States. Each of them directed payment of other debts that exceeded the amount of Olympia's debt to the United States.

71.     Reddy, Williams, and Redin are therefore individually, jointly, and severally liable to the United States for the full amount of Olympia's debt to the United States.

72.     The United States is therefore entitled to recover damages in an amount to be determined.

### Fourth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(a)(1)

#### Against Defendants Alecto, Sherman Hospital, and Alecto Sherman

73.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

74.     During the relevant period, at various times, Olympia made direct or indirect transfers of funds to Defendants Alecto, Sherman Hospital, and Alecto Sherman that were not given for reasonably equivalent value.

75.     At the times it made these transfers, Olympia either was insolvent or became insolvent as a result of the transfers.

76.     To the extent Alecto, Sherman Hospital, or Alecto Sherman received transfers from Olympia indirectly rather than directly, they are liable under 28 U.S.C. § 3307 as subsequent transferees of fraudulently transferred assets, or as persons for whose benefit the fraudulent transfers were made.

15

77.     The United States is therefore entitled to damages from Alecto, Sherman Hospital, and Alecto Sherman, in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

### Fifth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(b)(1)(B)

### Against Defendants Alecto, Sherman Hospital, and Alecto Sherman

78.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

79.     During the relevant period, at various times, Olympia made direct or indirect transfers of funds to Defendants Alecto, Sherman Hospital, and Alecto Sherman that were not given for reasonably equivalent value.

80.     While it made these transfers, Olympia was engaged in a business for which its remaining assets were unreasonably small, and Olympia also believed or reasonably should have believed that it would continue to incur debts beyond its ability to repay as they became due.

81.     Defendants Alecto, Sherman Hospital, and Alecto Sherman were either (a) the first transferees of these fraudulent transfers, (b) the entities for whose benefit those transfers were made, or (c) subsequent transferees that were not good faith transferees that took for value. *See* 28 U.S.C. § 3307(b).

82.     The United States is therefore entitled to damages from Alecto, Sherman Hospital, Alecto Sherman, in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

**Sixth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(a)(2)**

**Against Defendants MPT LA, MPT Olympia, MPT Partnership, MPT Parent**

83.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

84.     At times described above, Olympia transferred funds, directly or indirectly, to Defendants MPT LA, MPT Olympia, MPT Partnership, and MPT Parent. These transfers were made for antecedent debts.

85.     MPT LA, MPT Olympia, MPT Partnership, and MPT Parent were insiders of Olympia within the meaning of 28 U.S.C. § 3301(5).

86.     At the time these transfers were made, Olympia was insolvent, and MPT LA, MPT Olympia, MPT Partnership, and MPT Parent had reasonable cause to believe that Olympia was insolvent.

87.     Defendants MPT LA, MPT Olympia, MPT Partnership, and MPT Parent were either (a) the first transferees of these fraudulent transfers, (b) the entities for whose benefit those transfers were made, or (c) subsequent transferees that were not good faith transferees that took for value. *See* 28 U.S.C. § 3307(b).

88.     The United States is therefore entitled to damages from MPT LA, MPT Olympia, MPT Partnership, and MPT Parent in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

## PRAYER FOR RELIEF

The United States therefore requests entry of judgment in its favor against the defendants, jointly and severally, as follows:

a.     For actual monetary damages against all defendants in an amount to be determined;

b.     For avoidance of all fraudulent transfers from Olympia, directly or indirectly, to other defendants in an amount necessary to pay Olympia's debt to CMS;

1      c.      For recovery of the United States' costs, including investigative, accounting,

2       collection, and administrative costs;

3      d.      For all other applicable costs, fees, and interest; and

4      e.      For such other and further relief as the Court deems appropriate.

5   Dated: March 9, 2023                  Respectfully submitted,

6                                          BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General
7
                                           /s/ John R. Kresse
8                                          **RUTH A. HARVEY**
                                           Director
9                                          **MICHAEL J. QUINN**
                                           Senior Litigation Counsel
10                                         **JOHN R. KRESSE**
                                           Trial Attorney
11                                         **T. DIETRICH HILL**
                                           Trial Attorney
12                                         United States Department of Justice
                                           Civil Division, Commercial Litigation Branch
13                                         1100 L Street NW, 7th Floor
                                           Box 875, Ben Franklin Station
14                                         Washington, DC 20044
                                           John.Kresse@usdoj.gov
15                                         Direct 202-598-3811 / Fax 202-514-9163

16                                         *Attorneys for Plaintiff United States of America*

17

18

19

20

21

22

23

24

25

26

27

28